Filed 11/28/23  P. v. Wellington CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has California not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,　　Plaintiff and Respondent,　　v.　　MICHAEL BLAIR WELLINGTON,　　Defendant and Appellant. | B318724　　(Los Angeles County Super. Ct. No. BA492420) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo, Judge.  Affirmed.

Winston Kevin McKesson for Defendant and Appellant.

Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendant Michael Blair Wellington appeals from his convictions for murder and possession of a firearm by a felon. He makes several arguments: his murder conviction must be reversed because there is insufficient evidence of premeditation and deliberation; the court abused its discretion in taking one of the prosecutor's witnesses out of order; the trial was infected with judicial misconduct, prosecutorial misconduct, and ineffective assistance of counsel; and the court abused its discretion in denying his motion for a new trial. We affirm on all grounds.

## FACTS AND PROCEDURAL BACKGROUND

### 1. The Murder

Defendant (then 58 years old) and his brother, Jonathan (then 70 years old), co-owned a house in Los Angeles. Defendant used to live in the house with his brother but moved out four months before the shooting when he married his wife. Since then, Jonathan had been living in the house where defendant also had been operating his floral business. On December 19, 2020, Jonathan's friend Jackson (the victim) came over to the house and parked his car partly on the lawn. This was not the first time Jackson had parked on the lawn. Two weeks prior, defendant and Jackson had argued about Jackson parking in the same place.

On December 19th, defendant's wife came over to the house with her sister and her friend (Lauren). She saw Jackson's car on the lawn and told Jackson to move the car. Jackson refused. The wife telephoned defendant and told him a car was on the grass.

Defendant arrived shortly thereafter and entered the house, where he found his wife, his sister-in-law, and Lauren in

2

or near his bedroom.  His brother Jonathan and victim Jackson were in the dining room.  Defendant argued with Jackson about the car being parked on the grass.

Everyone then went outside.  Defendant got into his car, accelerated up the driveway, and rammed it into Jackson's with enough force to leave skid marks on the ground.  Next, defendant got out of the car and resumed arguing with Jackson and pointed a semiautomatic gun at Jackson.  Jackson fled toward the house with his hands up.  Defendant fired the weapon, hitting another car parked in the driveway.

Defendant chased Jackson, who entered the front door of the house.  Defendant shot through the screen door, hitting Jackson.  He then followed Jackson inside.  Witnesses heard two to three gunshots fired inside the house, and subsequently discovered Jackson's body inside.

### 2.    *Police Investigation*

The responding police officer encountered Jonathan, the brother, who was "hysterical" and yelling.  The officer found Jackson's body at the end of the hallway, next to a bookshelf. Jonathan told the officer that defendant had killed Jackson.  The coroner subsequently found that Jackson suffered three fatal gunshot wounds to the back of the head, right side, and back.

The officer observed that the victim's vehicle appeared to have been pushed onto the front lawn, and a second vehicle parked in the driveway had a bullet lodged in the left back panel. Inside defendant's bedroom, the officer discovered a bag containing a gun lock but no gun.  A search of the house also revealed a gun in the brother's locked bedroom.  The police did not find bullet casings at the scene; nor did they locate the murder weapon.

3

### 3.   *Information*

The Los Angeles County District Attorney's Office filed a felony information charging defendant with murder (Pen. Code, § 187, subd. (a); count 1), and possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(l); count 2).[1]  As to count 1, the information alleged that defendant personally used a firearm (§ 12022.5, subd. (a)).  As to both counts, the information alleged defendant had suffered one prior strike—a 2005 conviction for assault with a deadly weapon (§§ 667, subd. (d), 1170.12, subd. (b)).

### 4.   *Trial and Sentencing*

Defendant's murder trial commenced in late September 2021.  The prosecutor elicited testimony from police officers who responded to the scene, detectives who investigated the murder, criminalists, the coroner, the wife's sister, and Lauren.  Due to air travel delays, the coroner testified after defendant began his case in chief, over defendant's objection.  Because Jonathan had died in the interim, the prosecutor read Jonathan's preliminary hearing testimony into the record.

Defendant testified on his own behalf, characterizing his conduct as self-defense.  Defendant had a contentious relationship with his brother, Jonathan.  Defendant stated Jonathan had assaulted him with pistols several times and threatened to have his "gang banging buddies beat [him] up and stomp [him] out."  Defendant testified that Jonathan's friend Jackson had threatened him one to two months before the murder when defendant asked Jackson to move his car off the sidewalk in front of the house.  Defendant explained he did not

---

[1]     All further undesignated statutory references are to the Penal Code.

4

sleep at the house he co-owned with his brother mostly because he feared Jackson, "the gunplay and all of that." Defendant stated he felt threatened on the day of the murder, when Jackson reiterated that he would not move his car and told defendant not to disrespect him.

Defendant testified that he drove his car into Jackson's car in an attempt to move it, but was unsuccessful. When defendant's wife tried to diffuse the situation, Jackson responded: "You don't know who the F I am?" and said he was "gonna fuck [defendant] up." Meanwhile, defendant's brother stood on the porch, encouraging Jackson to "fuck [defendant] up" and to "[l]ay him out." Jackson also threatened to harm defendant's wife if she did not move.

Defendant stated he did not have a weapon on him at the start of the altercation. But the victim did. Defendant and Jackson wrestled over the gun, and the gun fired twice. Defendant got the gun away from Jackson. Defendant testified that he was "terrified" and thought Jackson was going to kill him. Jackson ran to the front door and defendant followed. When Jackson was at the door, defendant had just reached the porch. At that moment, defendant fired the gun at Jackson. Jonathan, who was on the porch, told Jackson, "Go get my gun. It's in the bedroom." Defendant saw Jackson move down the hallway toward the bedrooms. Defendant fired two shots at a bookcase, where Jackson was hiding.

Defendant said he was scared during the encounter because he knew that Jackson was a gang member. Defendant got into his car, left the scene, and took the gun with him. He later threw the gun in a dumpster. The violence lasted two

minutes from the time defendant reversed his car after hitting Jackson's vehicle.

The defense also presented testimony from several of defendant's friends, defendant's cousin, and defendant's sister, all of whom indicated defendant was honest, truthful, and nonviolent. Defendant's sister testified her brothers would argue over issues regarding the house and that Jonathan bullied defendant "for many years." Three defense witnesses stated they knew defendant and Jonathan, and that Jonathan had threatened defendant with a gun on a number of occasions. The defense also elicited testimony from criminalists that Jackson had marijuana and alcohol in his system during the incident. Defendant's wife, who the defense called as a witness, refused to testify, invoking the Fifth Amendment on the advice of her attorney.

On October 4, 2021, a jury convicted defendant of first degree murder and possession of a firearm by a felon, and found the gun allegation true. Defendant filed a new trial motion based on ineffective assistance of counsel for failure to retain gang and mental health experts.[2] The trial court denied the motion. The court sentenced defendant to an aggregate term of 31 years to life in state prison. The court imposed 29 years to life for count 1— 25 years to life for the substantive offense plus the mid-term of four years for the gun enhancement. The court imposed a determinate term of two years for count 2, to run consecutively.

Defendant appealed.

---

[2] After the conclusion of trial but before the new trial motion was filed, defendant's current appellate counsel substituted in as defense counsel.

6

## *DISCUSSION*

Defendant makes six arguments on appeal: (1) substantial evidence does not support his first degree murder conviction, (2) the court abused its discretion when it had defendant start his case before the prosecutor examined her last witness, (3) the court committed judicial misconduct and violated defendant's right to due process, (4) the prosecutor's misconduct violated his constitutional rights, (5) he suffered from ineffective assistance of counsel, and (6) the court abused its discretion in denying a new trial. We address each argument in turn.

## 1. *Substantial Evidence Supports Defendant's First Degree Murder Conviction*

Defendant argues there was insufficient evidence of malice aforethought, premeditation, and deliberation to support his first degree murder conviction. He asserts he "felt fearful, threatened and acted in self-defense. [Record cite] There was no intent to kill [Jackson] at all." Citing his own testimony, defendant asserts there was no premeditation or deliberation, insisting he acted in the moment. The opening brief spends little time assessing the actual evidence at trial, resting instead on general summaries of the proceedings.

### a. *Applicable Law*

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation. . . . Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is

7

reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) "We determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] In so doing, a reviewing court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Morales* (2020) 10 Cal.5th 76, 88 [internal quotation marks omitted] (*Morales*).)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) If the murder is "willful, deliberate, and premeditated," it is first degree murder. (*Id.*, § 189, subd. (a).) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*Morales*, *supra*, 10 Cal.5th at p. 88 [citations and internal quotation marks omitted].)

Three categories of evidence are considered in determining the existence of premeditation and deliberation: (1) planning activity—"facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) motive—"facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and

8

(3) manner of killing—"facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason'. . . ." (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).)  These three categories provide a framework for appellate review.  They are not exhaustive, nor is evidence in each category required to support a first degree murder conviction.  (*Morales*, *supra*, 10 Cal.5th at pp. 88–89.)

      b.     *Substantial Evidence Supports the First Degree Murder Conviction*

Defendant asserts there is insufficient evidence of planning, motive, and manner of killing to support his first degree murder conviction.  The record discloses otherwise.

**Planning.**  " 'In the context of first degree murder, premeditation means "considered beforehand" ' (*People v. Mayfield* (1997) 14 Cal.4th 668, 767) and deliberation means a ' "careful weighing of considerations in forming a course of action. . . ." ' (*People v. Solomon* (2010) 49 Cal.4th 792, 812).  'The process of premeditation and deliberation does not require any extended period of time.' (*Mayfield*, at p. 767 [the true test of premeditation is the extent of the reflection, not the length of time].)" (*People v. Salazar* (2016) 63 Cal.4th 214, 245 [parallel citations omitted].)

The jury could reasonably have inferred that before engaging in the confrontation with Jackson, defendant armed himself.  The wife's friend and Jonathan testified that defendant chased and shot at the victim.  Neither indicated the gun was Jackson's or that defendant wrestled the gun from Jackson as

9

defendant testified.  The jury could also infer from the gunlock that was found in defendant's room that the murder weapon was defendant's, not Jackson's.

Defendant's decision to bring a loaded weapon into a confrontation with a purported gang member shows defendant anticipated a violent encounter.  Wielding a loaded firearm demonstrated preparation and supported the jury's inference of planning.  (See, e.g., *People v. Salazar, supra*, 63 Cal.4th at p. 245 ["defendant brought a loaded gun with him to the Beef Bowl, demonstrating preparation"].)

The jury could also have inferred that defendant weighed and considered his course of action before killing the victim because defendant followed the already-injured, retreating, and unarmed victim into the house, and then shot him two more times, once in the back of the head.  The subsequent gunshots illustrated that defendant had an objective to kill – he was not merely acting in self-defense.  (*People v. Romero* (2008) 44 Cal.4th 386, 401 [jury could infer planning from evidence that defendant brought a gun to the store and shot victim in the back of the head].)

Citing his own testimony, defendant argues he had insufficient time to plan because the confrontation lasted two minutes.  Again, defendant asks this court to second guess the jury's findings and weighing of the evidence, which we do not do on appeal.

***Motive.***  " 'Motive is the emotional urge that induces a particular act.'  [Citation.]  ' "[T]he law does not require that a first degree murderer have a 'rational' motive for killing." '  [Citation.] 'Anger at the way the victim talked to [the defendant] [citation] or any motive, shallow and distorted but, to the perpetrator,

10

genuine[,]' may be sufficient.' [Citation.] '[T]he incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it.' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 495.)

Two weeks before the shooting, defendant became very upset when Jackson parked on the grass in front of his house. On the day of the murder, Jackson again parked on the grass, enraging defendant. Lauren testified that when defendant arrived, he was very angry to see Jackson's car on the lawn. She said she had never seen him so angry before: "It was almost as if he was the devil himself." Defendant then rammed Jackson's car in an attempt to move it before he shot at Jackson. The jury could reasonably infer that defendant's motive to kill Jackson was founded on the ongoing dispute between the two men.

***Manner of killing.*** A particular and exacting manner of killing supports the inference "that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) At issue is whether there was "a calculated design to ensure death rather than an unconsidered explosion of violence." (*People v. Horning* (2004) 34 Cal.4th 871, 902–903.)

Here, defendant continued to pursue the retreating, injured victim until defendant killed him. The jury could infer from defendant's persistence and pursuit that his actions went beyond impulse and that he was acting out a plan or design, albeit a short one, to kill. (See *People v. Brady* (2010) 50 Cal.4th 547 [the manner of killing supported a finding of premeditation and deliberation because the defendant shot the victim three times, including in the back as the victim was retreating, to ensure the victim died].)

11

Based on the record and each of these factors, we conclude substantial evidence of malice aforethought, premeditation, and deliberation support defendant's first degree murder conviction.

c.   Substantial Evidence Supports the Jury's Finding that Defendant Did Not Act in Self-Defense

Defendant next argues the evidence fails to support a finding of malice because he "felt fearful, threatened, and acted in self-defense.  [citation deleted.]  There was no intent to kill [Jackson] at all."  The People bear the burden of proof on the absence of self-defense in order to establish the murder element of malice.  (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1167.)  Yet, the evidence produced by the prosecution painted a different picture:  defendant rammed his car into Jackson's and then shot at Jackson as he ran away with his hands up, showing he was unarmed.  A jury could reasonably conclude that the prosecution had disproved defendant's claim of self defense.  That defendant shot multiple times at an unarmed Jackson, even after Jackson retreated into the house, showed defendant acted intentionally in recognition of the danger to human life and did not act of fear.

At trial, the court instructed on defendant's self-defense theory, and the jury rejected it.  Defendant essentially asks us to second-guess the jury's factual determination.  That is not our role.  " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

2.   *The Trial Court Properly Allowed the Prosecution's Witness to be Taken Out of Order*

Defendant asserts the court abused its discretion "when it forced [him] to begin his case in chief prior to the closing of the People's case."  We disagree.

12

***Applicable Law.*** In general, the "district attorney, or other counsel for the people shall . . . offer the evidence in support of the charge. The defendant or his or her counsel may then offer his or her evidence in support of the defense." (§ 1093.) Nonetheless, this order of proof rule is not mandatory. (See *People v. Moore* (1945) 70 Cal.App.2d 158, 162 (*Moore*).) " 'A court is warranted in departing from the order of proof prescribed by section 1093 of the Penal Code under proper circumstances.' " (*Ibid.*) The order of proof lies within the sound discretion of the trial court. (Pen. Code, § 1094; Evid. Code, § 320 ["court in its discretion shall regulate order of proof"]; Evid. Code, § 772, subd (b) [for good cause, the court can disrupt the ordinary flow of trial testimony]; *People v. Roybal* (1998) 19 Cal.4th 481, 511.) We only reverse if "the discretion appears to have been grossly abused, and this abuse must affirmatively appear." (*Moore,* at p. 162.)

***Proceedings at Issue.*** On the second day of trial, the prosecutor informed the trial court that she had a travel-related issue with one of her witnesses. The coroner was supposed to fly in from Texas that morning so he could testify that day, but due to weather and the plane's mechanical problems, his flight was cancelled, and all other flights were all booked. The coroner would likely arrive the next day. The prosecutor informed the court that she had three other witnesses ready to testify that day, but their testimony would not take more than 45 minutes.

The court stated it did not want down time and would take the coroner's testimony out of order. The court informed defendant that he would begin his case that day and the coroner could testify when he finally arrived. Defense counsel stated "I don't agree to it. But if that's what you want to do, fine."

13

Later, at the hearing on defendant's motion for a new trial, the court explained its decision to allow the coroner to testify after the defense had started calling witnesses. The court stated:

"As to the order of the testimony, this trial occurred during the pandemic, 9/20/2021. We had trouble with trying to keep jurors, with witnesses, with the coordination of the order of the trial; people calling sick, people calling in positive, people not well.

"In order [to] preserve the jurors on this case and keep the trial moving forward, the court permitted witnesses [to] be taken out of order. And pursuant to all the statutory provisions, the Rules of Court, the Evidence Code, the Penal Code, . . . the court took the witnesses out of order as the court is authorized to do.

". . . Defense still called all its witnesses intended and still had every right to call others as needed based on any change of order. The reality is the change in the order of the trial did not make any impact on the overwhelming evidence the jurors and the court heard."

***No Abuse of Discretion.*** Defendant argues that having the coroner testify after defendant testified "fundamentally crippled" his defense. Defendant asserts he "had just presented his strongest witness, himself, and the next day the People present a coroner discussing how the victim died and how the bullets led to his death. There is no way Appellant could get a fair trial after that."

Defendant cites *People v. Rodriquez* (1943) 58 Cal.App.2d 415, 419 (*Rodriquez*) for support. There, the Court of Appeal held

14

it was improper to permit the prosecution to withhold the defendant's confession (a material part of the prosecution's case) until rebuttal of the defense evidence. (*Ibid.*)

We conclude there was no abuse of discretion. The trial took place during the COVID-19 pandemic, and the trial court stated several times that proceedings were being handled differently because jurors were not appearing in court due to COVID. Given this circumstance, as well as ambiguity about exactly when the coroner would arrive, the court's decision to keep the trial moving and have defendant begin his presentation of evidence was reasonable.

Defendant also does not explain why the order of the witnesses' testimony prejudiced defendant. For example, there is nothing in the record that suggests the coroner had advance knowledge of defendant's testimony and couched his own testimony to take into account what defendant had told the jury. Nor do we see any other obvious signs of prejudice. Defendant's theory of the case was that he acted in self-defense. He did not deny shooting and killing the victim. The coroner testified that the victim was shot three times and died from his wounds. The prosecution's evidence was not used in rebuttal or to ambush defendant, as it was in *Rodriquez.*

### 3. *Defendant Forfeited Claims of Judicial Misconduct*

Defendant argues that the court prioritized a fast trial over a fair one, and that he was prejudiced as a result. Defendant identifies two occasions of alleged misconduct by the court.[3] We

---

[3]    Defendant asserts there were five occasions of misconduct and then lists only four events. In doing so, defendant reiterates his argument that the court erred in taking the prosecution's

15

conclude defendant forfeited his contentions by failing to raise them below, and even assuming these issues were preserved for review, his argument lacks merit.

*The Alleged Misconduct.* The first occasion defendant points to was when the court allowed the defense to cross-examine a police officer before the prosecutor finished her direct examination. The court permitted this because defense counsel agreed to cross while the prosecutor queued up a video of the officer's body camera footage. After defense counsel completed his questioning, he objected to the prosecution offering the video into evidence based on relevance (Evid. Code, § 352), stating that the video was cumulative and not useful for impeachment. The court overruled the objection, explaining that the video was not being offered for impeachment but rather the prosecutor "was going to conclude with this. We let you do your cross-examination while her computer was booting up. So this is still part of her case in chief. [¶] Court is going to permit it." Defense counsel responded: "I understand that, but I still under [Evidence Code section] 352 I don't believe it's relevant." The court overruled that objection. Defense counsel was permitted to cross-examine the witness again after the prosecutor completed her direct examination, but he declined.

---

witness out of order. We have thoroughly addressed that issue in the preceding section and therefore do not rehash it.

Of the remaining three alleged incidents of misconduct, two deal with the same event: defendant's cross-examination of a police officer before the prosecutor completed her direct examination. As such, there are only two instances of alleged misconduct to be addressed.

16

Second, defendant takes issue with a comment the court made when it required the prosecutor to reveal her impeachment evidence in advance of questioning defendant.  The court explained to defense counsel:  "I am trying to move this along a little bit more efficiently for the jurors, and that's why I am having her [the prosecutor] tell us initially what the area of impeachment is going to be so that we're not having to stop every single time and have you review and say 'I don't think it's relevant.'  Thus far this is relevant."

***Forfeiture.***  We first observe defendant failed to object to any alleged misconduct and thus forfeited the arguments on appeal.  "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial."  (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.)  A defendant's failure to object, however, does not preclude review " 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile."  (*Ibid.*, citations omitted.)

Defense counsel's only objection was to admission of the video under Evidence Code section 352.  Defense counsel never objected to cross-examining the police officer before the prosecutor finished direct examination.  Nor did defense counsel object to the court asking the prosecutor for a preview of her impeachment evidence.  In his reply brief, defendant asserts objection would have been futile because the court favored the prosecutor, and he would have been prejudiced by his counsel saying " 'I object to your misconduct.' "

We disagree with defendant's characterization of the record.  We see nothing that suggests the court's rulings were biased or tended improperly to favor one side over the other.

17

Defendant's opening brief begins with the argument that the trial court abused its discretion by taking a witness out of order solely out of a desire to move the case along. From there, every procedural ruling becomes a claim of judicial misconduct on appeal without an objection raised in the trial court even though the record discloses none. Defendant could have objected to commencing cross examination before the prosecutor completed direct. Defendant could have objected to the trial court assessing admissibility of the impeachment evidence in advance of impeachment. Defendant did not, nor did he assert judicial misconduct in the trial court.

*No Misconduct.* Even if these issues had been preserved for review, we conclude there was no misconduct individually or cumulatively. Judicial misconduct occurs when " ' "the judge's behavior was so prejudicial that it denied [defendant] a fair, as opposed to a perfect, trial." ' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 768.)

Defendant asserts that the judge "showed bias, prejudice, and partial [sic] against [defendant] before, throughout, and at the conclusion of the cases. Judge Escobedo [sic] actions of prioritizing the speed of the trial irrespective of [defend]ant's rights clearly show distain [sic] for [defendant]. Viewing all events cumulatively Judge Escobedo did not act impartially or carry out the duties of his job. Based on Judge Escobedo's misconduct and its prejudicial effect on Appellant's case and rights the Court must reverse said conviction and dismiss."

Defendant's generalized statements do not come with any explanation as to what aspect of the court's conduct demonstrated bias or prejudice. Nothing in the record indicates the judge moved trial along because it was biased against

18

defendant. To the contrary, when controlling the pace of trial, the court stated it was focused on the potential loss of jurors due to illness and exposure to COVID-19. A "trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Nor does the record show the outcome of this case would have been different had the judge ruled as defendant suggests.

## 4. *Defendant Forfeited His Claim of Prosecutorial Misconduct Regarding Charges to be Filed Against Defendant's Wife*

Defendant argues the prosecutor committed misconduct by allegedly implying she would file charges against defendant's wife as an accessory after the fact if she testified.[4] A "claim of prosecutorial misconduct is forfeited when there was neither a

---

[4] During trial, defense counsel indicated the wife would testify that she saw Jackson threaten and attack defendant on December 19, 2020. The wife also intended to testify that she had witnessed Jonathan threaten defendant with guns within the previous year. The prosecutor responded that she intended to impeach the wife with her statements from previous interviews, during which she had made statements to the contrary. Based on recorded jail calls, the prosecutor believed the wife intended to lie on the stand. The prosecutor also commented that the wife was involved as an accessory after the fact, but that she did not intend to file charges against the wife. The trial court appointed counsel to represent the wife. When defense counsel called her to testify, the bar panel attorney informed the trial court that the wife did not want to testify and would invoke her Fifth Amendment privilege against self-incrimination.

19

timely and specific objection nor a request for admonition." (*People v. Powell* (2018) 6 Cal.5th 136, 182.) Here, defendant did not object to the prosecutor's conduct and thus forfeited the issue on appeal.

In his reply brief, defendant asserts "For the same reason stated in the previous section Appellant believes this claim falls under one of the exceptions to forfeiture." Defendant's previous section declares that the objection would be futile because the court was biased in favor of the prosecutor and objections would prejudice defendant. We are unpersuaded by defendant's cursory, undeveloped assertions. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 ["[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration."].)

## 5. *The Ineffective Assistance of Counsel Claims Are Meritless*

Defendant argues his appointed counsel violated his right to effective assistance of counsel by failing to retain a gang expert and a mental health expert. Defendant asserts the gang expert could have bolstered his self-defense theory because the expert "would have talked about the fear individuals have for gang members." Defendant contends a mental health expert would have examined defendant's fight-or-flight response, sanity, self-defense belief, mental state during the murder, and altered personality during the murder. Defendant asserts: "If trial counsel had hired the proper experts to discuss Appellant's mens rea it could have had a reasonable probability to alter the jurors mind on what actually caused the accident, as well as the Appellant's state of mind. This all could have changed the

20

verdict or at least lessened the charges to second-degree murder or manslaughter."

Attached to defendant's motion for a new trial were declarations from a gang expert and a clinical trauma specialist. Both attested to reading all or part of defendant's testimony, but not the testimony from other witnesses. The gang expert wrote that most people in Los Angeles do not have any idea how violent gang members are, and it was his "expert opinion a gang expert should have been called to give expert testimony on defendant's gang fear." The trauma specialist attested that based on defendant's testimony, he believed defendant suffered from an extreme fight-flight reaction, meaning he acted based on survival reflexes and not from thoughtful consideration during the shooting.

**Applicable Law.** To prevail on a claim of ineffective assistance of counsel, a defendant must establish (1) that his counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that, but for counsel's error, a different result would have been reasonably probable, thus resulting in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

It is well established that "decisions . . . whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) "If the record on appeal

sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

**No Ineffective Assistance.** Defendant does not identify anywhere in the record that counsel had no rational tactical purpose for not calling these experts. Defendant does not indicate that counsel was asked for a reason behind his tactic and failed to provide one. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.) Nor is there any evidence that there can be no satisfactory explanation for choosing not to call these experts. (*Ibid.*) For example, defendant does not identify any evidence indicating trial counsel did not consult with a gang or mental health expert. We do not know if counsel did so and concluded the experts would not provide helpful testimony.

### 6. *The Motion for a New Trial Was Properly Denied*

Finally, defendant argues the court abused its discretion in denying his new trial motion. "We review the trial court's denial of a motion for a new trial for abuse of discretion." (*People v. Watts* (2018) 22 Cal.App.5th 102, 115.)

In the motion, defendant raised the same claims that counsel afforded him ineffective assistance of counsel by failing to retain gang and mental health experts. The trial court denied the motion, finding that the evidence "overwhelmingly . . . show[ed] that defendant's acts were premeditated and deliberate." The court found that the "appointment of experts would not have given a more favorable outcome as the jurors clearly considered all aspects of the trial and the witness' testimony." The court explained that the evidence of defendant's

22

behavior was "so incredibly overwhelming that gang and mental health evidence was minimized.  It did not play a part in the incident itself."

We conclude the trial court did not abuse its discretion in denying defendant's new trial motion.  As explained in the preceding section, defendant's arguments about ineffective assistance of counsel are unpersuasive.  We agree with the trial court that the evidence of defendant's guilt was great, and defendant could not have achieved a better outcome even with testimony from such expert witnesses.

### DISPOSITION

We affirm the judgment.


RUBIN, P. J.

WE CONCUR:



BAKER, J.



KIM, J.

The People v. Michael Blair Wellington
B318724


BAKER, J., Concurring

I join the opinion for the court in full. I write separately only to express the further view that defendant Michael Wellington's (defendant's) claim of prosecutorial misconduct is substantively meritless as well as forfeited. Defendant has not shown the prosecution improperly threatened a witness with prosecution to prevent the witness from testifying. (See, e.g., *People v. Harbolt* (1988) 206 Cal.App.3d 140, 155.) The prosecution expressly disclaimed any intent to file charges against the witness and, at most, advised the court (not the witness) of theoretical criminal exposure. The court did its duty under the circumstances by appointing separate counsel for the witness. (*People v. Warren* (1984) 161 Cal.App.3d 961, 972 ["when a trial court has reason to believe that a witness may be charged with a crime arising out of events to which he might testify, it has a duty to [e]nsure that the witness is fully advised of his privilege against self-incrimination"].)


BAKER, J.


I concur:


KIM, J.